## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

      Plaintiff,

v.

Demarlo Dontrell Hudson,

      Defendant.

Case No. 20-cr-27 (SRN/DTS)

**REPORT AND RECOMMENDATION**

      Defendant Demarlo Dontrell Hudson faces two felony charges of possessing and distributing fentanyl in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B). Indictment, Dkt. No. 1 (Ind.). He moves to suppress evidence investigators obtained while searching his residence and his music studio.[1] Am. Mot. to Supp. 1–3, Dkt. No. 55. Hudson alleges generally that the search warrants lacked probable cause because information supporting them was stale and lacked specificity. *See* Def.'s Mem., Dkt. No. 74. For the reasons discussed below, the Court recommends that Hudson's motions to suppress be denied.

### FINDINGS OF FACT

#### I.    The Criminal Allegations

      A grand jury indicted Hudson for possessing and distributing "imitation Oxycodone pills . . . containing a detectable amount of fentanyl." Ind. 1–2. The United States alleges Hudson possessed nearly 500 imitation oxycodone pills and had distributed about 1,000 of those same pills, both of which contained a detectable amount of fentanyl. Ind. 1–2.

---

[1] Hudson originally moved to suppress other evidence law enforcement obtained from searching his vehicle and from GPS tracking of it. Mot. to Supp. 1–3, Dkt. No. 55. His post-hearing briefing provides no argument on those issues nor establishes any basis on which this Court should suppress that evidence. Nor has Hudson provided the Court a copy of these warrants. As a result, the Court considers these motions withdrawn and the arguments waived and will not further address them in this Report and Recommendation.

The United States asserts Hudson is part of a large interstate drug trafficking and distribution conspiracy that has been the subject of a long-term multi-agency criminal investigation. Gov't Resp. Exs. 1–4, Dkt. Nos. 57-1–57-4. This conspiracy allegedly involves marijuana dispensaries or grow houses in Michigan, counterfeit oxycodone pills obtained from China and pressed into pill form in Chicago, and distribution in Minnesota of both marijuana and the imitation oxycodone pills containing fentanyl or a fentanyl analogue. The interstate investigation into this conspiracy has lasted more than a year and has involved both local law enforcement and multiple federal agencies.

Between April and July 2019, investigators arranged for a confidential reliable informant (CRI) to purchase imitation oxycodone pills from Hudson at his music studio in New Hope, Minnesota. By monitoring these controlled buys and conducting surveillance, investigators observed Hudson travel directly from his residence in Plymouth, Minnesota to his music studio where he conducted multiple drug transactions. The CRI and another witness maintained contact with Hudson from May to November 2019, confirming that Hudson was still actively involved in the conspiracy and was willing and able to distribute both marijuana and imitation oxycodone pills. In December 2019 investigators applied for and executed four search warrants: two warrants to conduct K-9 sniffs at Hudson's music studio and his residence, followed by two warrants to search those same locations. Both K-9 sniffs yielded positive alerts for narcotics and both building searches uncovered drugs and firearms.

## II.    The K-9 Sniff Warrants

Investigators provided identical[2] affidavits and search warrant applications for the K-9 sniffs at Hudson's residence (new)[3] and his music studio. The applications requested to enter the curtilage of each property and execute a K-9 sniff at each location for the odor of narcotics emanating from the outer door seams. Gov't Resp. Exs. 1 & 3, Dkt. Nos. 57-1 & 57-3 ("K-9 War.").

The affidavits supporting each warrant application are bare bones. They explain that investigators worked with a CRI to investigate illicit narcotics distribution and firearm possession throughout the Twin Cities metro area. *Id.* at 2. Investigators had previously worked with this CRI, who had provided information about narcotics distribution and illicit firearm possession throughout the region. *Id.* The information the CRI provided investigators in the past had been reliable and had led to the seizure of large quantities of narcotics and firearms. *Id.*

The affidavits describe the investigation as substantial, involving multiple agencies and several controlled purchases of large quantities of narcotics. *Id.* The affidavits allege Hudson is a supplier of large amounts of fake oxycodone pills from China and marijuana grown in Michigan. *Id.* Hudson conducts narcotics transactions at his music studio, and controlled purchases of narcotics have been made from Hudson there. *Id.* Investigators also observed other narcotics transactions occur in the music studio's parking lot. *Id.*

---

[2] Though each warrant authorizes the search of a separate location, the Application for Search Warrant, supporting affidavit, and Search Warrant are identical apart from distinguishing between different addresses. Thus, the Court will refer to the K-9 warrants collectively as "K-9 War."

[3] Hudson had two residences in Plymouth during the period of this investigation. At the beginning of the investigation he lived on 53rd Avenue N., then moved to 60th Avenue N. The warrant at issue authorized investigators to search the 60th Avenue N. house. To differentiate between the two, the Court will refer to them as his "old" and "new" residences.

Investigators observed Hudson travel to and from his home directly before or after narcotics transactions at his music studio, where he spends a great deal of his time. *Id.* The CRI also confirmed that Hudson keeps narcotics at both his music studio and his residence. *Id.*

Hennepin County District Court Judge Janet Poston signed the sniff warrants on December 4, 2019 and investigators executed these warrants the next day. The K-9 positively identified the odor of "narcotics" at both Hudson's residence and his music studio. Gov't Mem. 1, 5; Dkt. No. 76.

## III.    The Building Warrants

After the positive K-9 sniffs, investigators sought and obtained warrants to search Hudson's residence (new) and his music studio. The warrants requested authorization to search for:

> Controlled substances to include, but not limited to, Marijuana Packaging equipment such as baggies, tin foil, knives, spoons, razors and scales. Documents, notes, papers, ledgers, pagers, computers including hard drives, peripherals and removable storage media, and videotapes, mobile phones and similar electronic devices that may be used to communicate for the purpose of drug transactions and/or to store electronic data related to drug trafficking such as names, phone numbers, call history, images or audio recording of drug trafficking, written or typed messages. Monies to show profit of the sale of controlled substances. Documents, receipts, letters, bills and identification to show constructive possession of the items seized. Firearms.

Gov't Resp. Exs. 2 & 4, Dkt. Nos. 57-2 & 57-4 ("Bldg. War.").

The affidavits supporting the two building search warrants are identical.[4] They first describe the affiant's (Officer Fricke) training, relevant experience, and assignment to the investigation task force, then summarize investigators' use of the CRI to gain information and conduct controlled buys. Bldg. War. at 2. The affidavits assert the CRI's reliability as

---

[4] The Court will refer to the warrants to search Hudson's residence and business collectively as "Bldg. War."

established by his previous work with investigators and the historical veracity of his information, which have led to the seizure of large quantities narcotics and firearms. *Id.* The affidavits explain that the long-term investigation involves multiple agencies and that investigators have conducted physical surveillance, coordinated controlled purchases of large quantities of narcotics, and have executed search warrants on related sites in other states in which hundreds of pounds of marijuana, thousands of fentanyl pills labeled as oxycodone, currency, firearms, and documents related to the drug trafficking operation have been seized. *Id.* at 3.

The investigation revealed Hudson's involvement in the drug trafficking organization, and the affidavit describes that Hudson supplies large amounts of fake oxycodone pills and marijuana, which he obtains from Michigan. *Id.* at 2. Hudson facilitates his transactions at his music studio property, and controlled purchases of narcotics from Hudson have occurred inside Hudson's studio. *Id.* at 3. Through surveillance investigators have observed other narcotics transactions with Hudson that occurred in the studio parking lot and noted that Hudson regularly travels to and from his home directly before or after conducting the drug deals. *Id.* The CRI confirmed that Hudson keeps narcotics at both his music studio and his residence. *Id.* at 2–3. The affidavit then recounts that investigators obtained the warrants for the K-9 sniffs at Hudson's new residence and his music studio, the execution of which detected the odor of narcotics at both locations. *Id.* at 3.

Hennepin County District Court Judge Janet Poston signed the building warrants on December 5, 2019; investigators executed them on December 10, 2019. From the search of Hudson's new residence officers recovered over 1,000 pills containing a fentanyl analogue, $3,100 in cash, and a 9 mm pistol. They also seized four cell phones, including one from Hudson's person, which law enforcement later searched after

obtaining a separate warrant. Gov't Resp. 4, Dkt. No. 54. From the search of Hudson's music studio officers recovered 479 pills containing actual fentanyl. *Id.*

## IV.    Information Omitted from the Affidavits

At the hearing on these motions, investigators provided details and context omitted from the affidavits, including the dates of specific drug transactions and other information that would have identified the CRI and cooperating witnesses.

### A.    Details of the Controlled Buys

The first controlled buy occurred in April 2019 when investigators arranged for the CRI to purchase pills resembling oxycodone from Hudson at his music studio. Gov't Resp. 3, Dkt. No. 54. The CRI met with Hudson inside his music studio. Tr. 27:23–25, Dkt. No. 71. While there Hudson sold the CRI 200 imitation oxycodone pills laced with a fentanyl analogue. Tr. 27:25–28:4; Gov't Resp. 4, Dkt. No. 54. Investigators conducted surveillance of this transaction and listened to a "body bug" the CRI wore. Tr. 28:8–17. Immediately after completing the transaction, Hudson returned directly to his residence (old) in Plymouth. Tr. 28:15–25.

Investigators conducted a second controlled buy in May 2019, which also occurred at Hudson's music studio. Tr. 29:3–11. Before the transaction, Hudson informed the CRI he needed to go home (old) to pick up the fentanyl pills. Tr. 29:19–30:4. Investigators observed Hudson arrive at his residence (old), then drive directly to his music studio, where he sold the CRI 1,000 pills. Tr. 30:19, 30:24–31:8.

A third controlled buy occurred at the end of July 2019. Tr. 31:13–14. Hudson arranged to sell 1,000 pills to the CRI at his music studio. Tr. 31:23–32:4. The CRI met Hudson at his music studio, but investigators suspect Hudson did not have the pills there. Tr. 32:7–11. The CRI paid Hudson for the pills at the music studio but made arrangements to complete the transaction at a restaurant in Maple Grove. Tr. 32:14–24. Investigators

followed the CRI from the music studio to the restaurant, where a third party delivered the pills to the CRI. Tr. 32:15–16, 21–25.

### B.    Other Information

At the beginning of November 2019 the CRI met with Hudson, who informed the CRI that he was keeping a low profile because "things were hot right now," referring to search warrants investigators had executed in the past two weeks in the Twin Cities and in Michigan, the location of a large Marijuana farm. Tr. 70:3–8. Though Hudson did not sell any drugs to the CRI, he did provide the CRI with a sample of imitation oxycodone pills, Tr. 70:23–71:2, and told the CRI he could still supply imitation oxycodone and up to twenty pounds of marijuana, Tr. 70:9–13, 71:12–16.

At the end of November—little more than a week before investigators applied for the first warrants—investigators interviewed an individual who reported having contact with Hudson. Tr. 72:16–20. That individual confirmed he could purchase pills or a pound of marijuana directly from Hudson at his music studio. Tr. 72:20–73:9, 73:19–20. The witness told investigators Hudson said he got his marijuana from a grow house in Michigan. Tr. 72:13–15.

### CONCLUSIONS OF LAW

The Fourth Amendment to the United States Constitution guarantees a person's right "against unreasonable searches and seizures." U.S. Const. amend. IV. It commands that "no Warrant shall issue, but upon probable cause . . . particularly describing the place to be searched, and the persons or things to be seized." *Id.* To meet this constitutional threshold police must not make material misstatements or intentional omissions in their probable cause affidavit supporting the warrant, which ensures the issuing judge's

decision to issue the search warrant rests on reasonably accurate information. *Delaware v. Franks*, 483 U.S. 154, 164–65 (1978).

Hudson's argument challenging the warrants is threefold: First, the five-month delay between the last controlled buy and the K-9 sniff warrants extinguished probable cause for those warrants, if it existed at all. Second, excluding the positive K-9 sniffs, the affidavits for the building warrants relied on impermissibly stale information and thus lacked probable cause. And finally, officers intentionally excluded relevant facts from the affidavits to mislead the judge who issued the warrants. But because the warrants were supported by sufficient probable cause, the facts were not stale, and the officers had good cause for excluding certain information from the warrant application affidavits, the Court recommends that Hudson's motions to suppress be denied.

## I.    The K-9 Sniff Warrants

### A.    Music Studio

Hudson concedes that investigators did not require a warrant to conduct the K-9 sniff of the front door of Hudson's music studio building. Def.'s Mem. 3, Dkt. No. 74. "A K-9 sniff is not a search within the meaning of the Fourth Amendment, and thus requires no probable cause to be performed." *United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005). Nor does Hudson have an expectation of privacy in odors emanating into a public location, *see United States v. Place*, 462 U.S. 696, 707 (1983), such as the parking lot and main entrance to Hudson's music studio, which were readily accessible to the public, *cf. Florida v. Riley*, 488 U.S. 445 (1989). Because the K-9 sniff of the exterior of Hudson's music studio was neither a search nor transgressed Hudson's reasonable

expectation of privacy, investigators required no warrant. Thus, the K-9 sniff was constitutional and the evidence obtained thereby need not be excluded.

### B.    Residence (new)

#### 1. Probable Cause

Hudson argues that the warrant for the K-9 sniff at his residence lacked probable cause. Def. Mem. 9–10, Dkt. No. 74. "Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances. If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." *United States v. Notman*, 831 F.3d 1084, 1088 (8th Cir. 2016). Judges issuing search warrants may "draw reasonable inferences from the totality of the circumstances" when reading the warrant application affidavit to determine whether probable cause exists. *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (quoting *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009)). Reviewing courts must afford "great deference" to the probable cause determination of the judge who issued the warrant and should resolve even "doubtful or marginal cases" in favor of a warrant's validity. *United States v. Butler*, 594 F.3d 955, 962 (8th Cir. 2010) (citation omitted); *see United States v. Ventresca*, 380 U.S. 102, 109 (1965). So long as the issuing judge had a "substantial basis" for concluding the "search would uncover evidence of wrongdoing," this Court must uphold the probable cause determination. *United States v. Horn*, 187 F.3d 781, 785 (8th Cir. 1999).

Sufficient probable cause supported the warrant for the K-9 sniff of Hudson's new residence. First, investigators observed Hudson travel to and from his old residence immediately before or after conducting controlled buys at his music studio. Tr. 30:23–

31:8; K-9 War. 2; *e.g.*, *O'Neil v. United States*, 966 F.3d 764, 772 (8th Cir. 2020) (holding officers' personal observations can establish probable cause when officers observed the drug transaction). Second, the CRI knew Hudson kept narcotics at both his music studio and house.[5] Tr. 41:10–15; K-9 War. 2; *see, e.g.*, *United States v. Braden*, 844 F.3d 794, 799 (8th Cir. 2016) (holding probable cause may rest on information from a reliable, known informant with first-hand knowledge). Thus, the investigators' observations and the CRI's knowledge both support the reasonable inference that Hudson kept drugs where he lived.

Hudson argues that the affidavit's nexus to his new residence is too scant to support probable cause to search there. Def.'s Mem. 9, Dkt. No. 74. The affidavit only twice mentions Hudson's residence: First by noting investigators' observations of Hudson's travel directly from his residence to the drug transactions, and second, the CRI's account that Hudson kept narcotics at his house. K-9 War. 2. Though certainly not detailed, this information, coupled with the contextual information also included in the affidavit, is enough to support the probable cause determination made by the issuing judge. *Day*, 949 F.2d at 978.

The fact that Hudson's residence changed from the time investigators observed his suspicious actions to when they obtained the warrant does not alter either this Court's analysis or the probable cause supporting the warrant. *United States v. Epps*, 570 F. App'x 197, 200 (3d Cir. 2014) (holding sufficient nexus for probable cause existed for warrant to search new residence even though affidavit described activity associated with former residence). The nexus the affidavit established was that Hudson keeps narcotics where he resides and transports those narcotics directly from his residence to his music

---

[5] The affidavits state only that the CRI confirmed that Hudson kept narcotics at his house, but do not specify whether that was Hudson's old house, new house, or both.

studio to sell them. If Hudson moved, it was a reasonable inference that so too did the drugs. The dog sniff at Hudson's residence was proper. Investigators' observations and the CRI's personal knowledge linking Hudson's residence to his drug distribution activity support a reasonable inference investigators would find contraband at Hudson's residence—new or old. *United States v. Koons*, 300 F.3d 985, 990 (8th Cir. 2002) ("An informant's tip is sufficient to support probable cause if the totality of the circumstances show that it is reliable.").

### 2.  Staleness

Hudson also argues the warrant authorizing the K-9 sniff of his residence was improper because the affidavit relied on stale information. Specifically, the most recent controlled buy from Hudson occurred in July 2019, yet investigators did not apply for the warrant until December 2019. Hudson asserts the information is stale and the warrant for the K-9 sniff of his residence, therefore, lacked probable cause. While "[p]robable cause must exist at the time of the search and not merely at some time earlier," *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005), "[t]here is no fixed formula for determining when information has become stale," *United States v. Smith*, 266 F.3d 902, 904 (8th Cir. 2001). Instead, timeliness of the information—or staleness—"depends on the circumstances of the case, including the nature of the crime under investigation and the property sought in the search." *Kennedy*, 427 F.3d at 1141; *United States v. Huyck*, 849 F.3d 432, 439 (8th Cir. 2017). Even "[i]f the elapsed time between the criminal activity and warrant issuance in the case leaves the evidence too stale to support a finding of probable cause, the nature of the crime and evidence sought may still militate in favor of

applying the good-faith exception." *United States v. Rugh*, 968 F.2d 750, 754 (8th Cir. 1992).

For investigations into ongoing narcotics operations, week- or month-long intervals between a target's last described act and investigators' application for a warrant does not make that information stale. *United States v. Carnahan*, 684 F.3d 732, 736 (8th Cir. 2012); *accord United States v. Petruk*, 929 F.3d 952, 960 (8th Cir. 2019) ("Where the crime under investigation is 'of a continuous nature,' the passage of time between the last described act and the application for a warrant is less significant."). In fact, lengthy drug trafficking activity does not become stale unless there is an indication that the activity has ceased. *See United States v. Oritz-Cervantes*, 868 F.3d 695, 700 (8th Cir. 2017) (holding information was not stale when investigators obtained it from ten controlled buys at multiple locations in the eight months before the warrant).

Nothing within the four corners of the affidavit suggests staleness or that Hudson's involvement in the drug trafficking conspiracy had ceased. To the contrary, the affidavit describes a lengthy investigation into a well-established drug trafficking operation. Investigators had time to embed a CRI into the operation, uncover operations in multiple states, and conduct extensive surveillance. The affidavit depicts Hudson's organization as well-established and complex, facts which undercut a belief that Hudson would simply stop distributing narcotics.

Hudson's staleness argument rests not on information *in* the affidavit but on information *not in* the affidavit. That is, while the affidavit describes multiple controlled buys, it does not mention that those controlled buys occurred five or more months before investigators applied for the warrants. Thus, it is the cure for the affidavit's lack of specificity that creates Hudson's staleness argument, not the content of the affidavit itself. But courts assess whether probable cause exists from the information within the four

corners of the warrant affidavit. Here, the affidavit establishes probable cause, but Hudson urges this Court to consider the dates of the controlled buys in assessing his staleness argument. But if this Court is to consider evidence outside the four corners of the affidavit, it must consider *all* such extrinsic evidence. What this Court cannot do is consider only the evidence supporting Hudson's staleness argument while ignoring the considerable extrinsic evidence negating it. When all of the evidence extrinsic to the warrant is considered, Hudson's staleness argument evaporates.

Though investigators had not successfully[6] conducted controlled buys from Hudson in the five months before the warrant issued, this in no way signifies the investigation ceased during that time. The nature of Hudson's alleged criminal activity was protracted and ongoing and the CRI maintained contact with Hudson between July and December: In November 2019 Hudson supplied the CRI with a small sample of imitation oxycodone pills and told him he was willing and able to sell up to twenty pounds of marijuana to the informant and others. Tr. 70:24–71:1, 71:7–17. Investigators also interviewed a cooperating witness in late November who confirmed he could buy both pills and marijuana from Hudson at that time. Tr. 71:17–72:3. That interview confirmed that Hudson was still actively selling both marijuana and imitation oxycodone pills from his music studio. Tr. 72:4–73:9. These facts establish Hudson's continued conduct in the time between the last controlled buy and when investigators applied for the warrants in December. Considering the totality of the extrinsic facts, what emerges is a clear picture that Hudson was actively engaged in distributing narcotics not only in April through July, but up through the very end of November, shortly before the warrants issued. Considering

---

[6] The CRI contacted Hudson in November 2019. Hudson told the CRI he was "keeping a low profile" because he perceived an increased law enforcement presence, but still provided the CRI with "sample" pills. Tr. 70:3–9, 70:24–71:1.

extrinsic facts does not expose staleness, it reveals a warrant supported by ample probable cause.

Hudson relies on *United States v. Wilkins*, in which the court invalidated a warrant supported by stale information. *United States v. Wilkins*, No. 5:00-cr-40043-1, 2000 WL 1279477, at *1 (D. Kan. Sept. 1, 2000). There, the search warrant affidavit relied on three controlled buys from more than four and one-half months earlier. *Id.* at *2. But in *Wilkins* there was "no allegation that defendant was involved in an ongoing conspiracy or continuous illegal drug activity over a substantial period of time." *Id.* It was the lack of ongoing illegal activity that was the basis for finding the information stale; the court did not find the mere passage of four months to render the information stale.

Thus, while the controlled buys may have occurred sometime in the past, the totality of the circumstances reveal Hudson's ongoing and recent involvement in the criminal enterprise that was under investigation. *See generally United States v. Day*, 949 F.2d 973, 978 (8th Cir. 1991), *cited with approval in Petruk*, 929 F.3d at 960 ("[I]nformation about criminal activity at an earlier, unspecified time may combine with factually connected, recent, time-specific information to provide a substantial basis for the conclusion that the criminal activity described in the affidavit is sufficiently close in time to the search warrant application."), *abrogated by Curtis v. United States*, 511 U.S. 485 (1994). The search warrant authorizing the K-9 sniff at Hudson's residence was not stale and was supported by sufficient probable cause.[7]

## II.    The Building Search Warrants

Hudson argues the warrants to search his residence and his music studio lacked probable cause, largely premised on his belief that the positive findings of the K-9 sniffs

---

[7] Hudson's real concern is that by deliberately omitting these dates investigators deprived the issuing judge the opportunity to fully assess whether the information had become

must be excluded. Having found the K-9 warrants valid, however, this Court finds that the positive K-9 alerts—along with the other investigation findings—provided probable cause for the building search warrants.

### A.    The Music Studio Warrant

Hudson maintains that the positive K-9 alert from the main door of his music studio's building cannot suggest a fair probability that police would find evidence in *his* studio, which, he argues, was located some distance from the outer main door of the building. Hudson rents an individual music studio inside a building containing about ten rental music studios. Tr. 62:3–8. Hudson's studio was the first studio through the main door on the other side of a small reception area and about ten to fifteen feet from the main entrance. Def.'s Mem. 10, Dkt. No. 74; Tr. 58:24–59:21. The K-9 positively alerted at the building's main entrance, not the door to Hudson's individual music studio.

Were the music studio K-9 sniff the only basis justifying the warrant, Hudson's argument would have more merit. But investigators' suspicions relied on more: The CRI conducted multiple controlled buy transactions with Hudson inside his music studio. Surveillance revealed that Hudson spent much time at his studio and investigators observed Hudson conduct several narcotics transactions in the parking lot. That Hudson appears to have used his music studio as the primary setting for conducting drug transactions explains why investigators sought the music studio search warrant. Hudson met his clients there, he conducted deals both in the parking lot and inside the building,

---

stale. This Court has conducted its own analysis of staleness and whether, without considering the extrinsic evidence, the warrant was supported by probable cause. Even if this is a close question this Court will defer to the issuing judge's probable cause determination. If the issuing judge and this Court are both in error, the investigators could rely in good faith on the warrants, as discussed infra.

and both the CRI and other individuals confirmed to police that Hudson—at least to some extent—operated his drug distribution business from inside his music studio.

Hudson focuses on the distance between the entrance to the building, where the positive K-9 alert occurred, and the physical location of his music studio within the building. This Court finds it unnecessary to assess whether the ten to fifteen feet makes any substantive legal difference in the overall analysis. Probable cause to search Hudson's music studio existed aside from the positive K-9 alert, and the results of the K-9 sniff merely bolster the judge's probable cause determination. Investigators observed Hudson enter his music studio just after conducting drug transactions in the parking lot, which alone creates sufficient probable cause for a warrant to issue. *O'Neil*, 966 F.3d at 772 ("[E]ntry into that apartment after the sale made it probable that evidence of criminal activity was within.").

Hudson also argues that because one controlled buy exchange occurred at a nearby restaurant, the search of the music studio is unjustified. This argument is unpersuasive. While one aspect of one controlled buy may have occurred elsewhere, the investigation confirmed that Hudson used the music studio for his drug distribution; he scheduled and consummated other deals there and the CRI confirmed that Hudson kept narcotics inside his studio. That one aspect of one transaction occurred elsewhere does not negate the facts supporting probable cause to search the studio, especially considering that other part of that very transaction—the monetary exchange—did occur at the music studio.

### B.    The Residence Warrant

A drug "dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." *United States v. Sundby*, 186 F.3d 873, 875–76 (8th Cir. 1999). Here investigators conducted a K-9 sniff of

Hudson's residence pursuant to a valid warrant. The K-9 alerted, indicating the presence of narcotics at Hudson's residence. That positive alert alone provided sufficient probable cause for the warrant to search Hudson's residence. But investigators had more than just the positive K-9 alert, including their own observation of Hudson's travel to the controlled buy locations directly from his residence as well as information supplied by the CRI. Investigators had sufficient probable cause for the warrant to search Hudson's residence.

## III. *Leon* Good Faith Exception

Even if a search warrant lacks probable cause, the search pursuant to that warrant is still valid if officers reasonably relied on the warrant in good faith. *United States v. Leon*, 468 U.S. 897, 920 (1984). It is the issuing judge's role—not law enforcement's—to assess whether the search warrant is supported by probable cause. So long as police have a reasonable basis for believing that an issued warrant is valid, *Leon*'s good-faith exception applies. *Id.* at 922–23. In assessing whether officers acted in good faith, courts may consider information officers knew but which they did not present to the judge issuing the warrant. *United States v. Thompson*, 976 F.3d 815, 822 (8th Cir. 2020).

Hudson argues the officers could not rely in good faith on the warrants because they had in bad faith concealed evidence from the issuing judge that would have revealed the absence of probable cause for the warrants. As alluded to previously and as described in further detail below, Hudson's argument fails. The excluded information, when considered in its totality, bolsters rather than diminishes probable cause for the warrants. Moreover, as discussed below, investigators did not act in bad faith in excluding the information they withheld from their affidavits. Therefore, even if this Court errs in finding probable cause for the warrants the investigators acted in good faith in reliance on those

17

warrants and the evidence obtained pursuant to those warrants should not be suppressed.

Investigators may intentionally omit necessary information from an affidavit to protect potential informants or witnesses. *United States v. Strini*, 658 F.3d 593, 597 (8th Cir. 1981) (holding affidavit omission intended not to enhance the contents of the affidavit but to protect the informant not a false statement under *Franks*); *see United States v. Glover*, 755 F.3d 811, 818 (7th Cir. 2014). Though an affidavit must contain enough factual content to establish probable cause, too much precision in an affidavit can unmask the identity of an informant. In such circumstances, generalized descriptions or rough explanations can support probable cause. *United States v. Matthews*, 753 F.3d 1321, 1325 (D.C. Cir. 2014); *Owens v. United States*, 387 F.3d 607, 608 (7th Cir. 2004).

Here, it is not that investigators lacked probable cause; instead, their omissions, which were made to protect the CRI and a cooperating witness, resulted in an affidavit that was lacking significant detail. There is a substantive distinction between a warrant issued on inadequate probable cause and one issued on an affidavit bearing permissible omissions. *See generally United States v. Carpenter*, 422 F.3d 738, 745 (8th Cir. 2005). Investigators knew enough information to establish probable cause to support a search warrant but chose to be vague in order to protect the identity of the CRI and other witnesses.

The hearing testimony reveals the breadth of information investigators knew about Hudson's involvement in the conspiracy when they applied for the search warrants. Investigators testified in detail regarding their findings from months of their multi-agency, interstate investigation. The testimony depicts intricate details of the workings of an interstate drug distribution chain. Investigators testified that including this information in their affidavits would have revealed the identity of the CRI and witnesses and endangered

their lives. Tr. 34:19–22. Given the nature of the information omitted this Court cannot conjure any other reason why investigators would have omitted these facts from their affidavits when they so clearly bolstered probable cause.

This investigation posed grave dangers to the CRI and witnesses. Investigators believed members of Hudson's criminal enterprise had kidnapped and tortured a woman to obtain information that would lead them to her boyfriend, who they believed had cooperated with police. Gov't Mem. 3, Dkt. No. 76. After trying to murder the boyfriend by shooting him multiple times, they executed his kidnapped girlfriend to eliminate her as a witness. *Id.* The CRI and cooperating witnesses faced life-threatening consequences if Hudson's associates discovered their identities. In fact, investigators' concerns materialized when an attempt to murder the CRI was made five days after the hearing on Hudson's motions. Gov't Mem. 3, Dkt. No. 76. Hudson remains a suspect in that attempted murder. *Id.* For this reason, investigators withheld details from their affidavits— such as the dates of specific drug transactions and other key investigation findings unique to the CRI—to conceal the identity of the CRI. The Court finds the investigators' testimony credible and their actions reasonable given the danger posed to the CRI and witnesses. Though investigators' omissions were intentional, their rationale for doing so was justified and necessary, not malicious or manipulative.

Though Hudson claims investigators made the omissions to mislead the issuing judge, Def.'s Mem. 10–12, Dkt. No. 74, there is no support for this assertion. Investigators did not omit details to mislead the issuing judge but to protect their sources. Tr. 34:16– 17. Given their extensive knowledge of the investigation and their justification for excluding certain facts, they reasonably relied on the issuing judge's determination that sufficient probable cause existed. Accordingly, even if the warrants were deemed invalid as unsupported by probable cause, the Court finds the officers acted in good faith and

reasonably relied on the validity of the search warrants. *See United States v. Rodriguez*, 484 F.3d 1006, 1012 (8th Cir. 2007) (reliance on warrant reasonable because officer corroborated information provided by informant and knew other information).

Finally, Hudson's request for a *Franks* hearing fails. A *Franks* challenge negating the *Leon* good-faith exception applies only when the warrant affidavit contains knowing and intentional false statements (or misleading omissions) made with reckless disregard for the truth, *Franks*, 438 U.S. at 155, not when investigators withhold identifying information to protect the safety of others, *Strini*, 658 F.3d at 597. As explained, while investigators' omissions were necessary to protect the CRI. Nothing suggests investigators sought to conceal the truth, mislead the issuing judge, or distort the factual basis for the warrant. A *Franks* challenge requires a defendant to first make a "substantial preliminary showing" of a false statement. *United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004). Hudson has not made that required preliminary showing.

## RECOMMENDATION

For these reasons, this Court recommends that:

1.    Defendant's Motion to Suppress Evidence Obtained as a Result of Unlawful Searches (Docket No. 18) be **DENIED**;

2.    Defendant's Motion to Suppress (Docket No. 50) be **DENIED**; and

3.    Defendant's Amended Motion to Suppress (Docket No. 55) be **DENIED**.

Dated: December 19, 2020                     __s/David T. Schultz____
                                             DAVID T. SCHULTZ
                                             United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to the magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).