# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **United States of America,** | **File No. 20-CR-27 (SRN/DTS)** |
| **Plaintiff,** | |
| | **ORDER** |
| v. | |
| **Demarlo Dontrell Hudson,** | |
| **Defendant.** | |

---

David Steinkamp and Justin Wesley, United States Attorney's Office, 300 South 4th St., Ste. 600, Minneapolis, MN 55415, for the Government

Jordan S. Kushner, Law Office of Jordan S. Kushner, 431 S. 7th St., Ste. 2446, Minneapolis, MN 55415, for Defendant

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant's Objections [Doc. No. 114] to Magistrate Judge David T. Schultz's December 19, 2020 Report and Recommendation ("R&R") [Doc. No. 77]. In the R&R, Magistrate Judge Schultz recommended the denial of Defendant's Motion to Suppress Evidence Obtained as a Result of Unlawful Searches [Doc. No. 18], Defendant's Motion to Suppress [Doc. No. 50], and Defendant's Amended Motion to Suppress [Doc. No. 55]. For the reasons set forth below, Defendant's Objections are overruled and the Court adopts the R&R, as modified.

## I.    BACKGROUND

The factual background of this case is more fully set forth in the R&R, which the Court incorporates by reference. (R&R at 1–7.) Defendant Demarlo Dontrell Hudson is charged in

a two-count indictment with distribution of fentanyl and possession with intent to distribute

fentanyl.  (Indictment [Doc. No. 1].)  He moves to suppress evidence obtained from three

warrants:  a K-9 sniff warrant for the exterior door of his residence (the "K-9 Sniff Warrant")

and two subsequent building search warrants for his residence and his music studio (the

"Residence Warrant" and the "Music Studio Warrant," or collectively, the "Building

Warrants").  He does not challenge a fourth warrant that authorized a K-9 sniff of the main

door of his music studio building.  (Def.'s Supp'l Mem. [Doc. No. 74] at 3.)  The two K-9

Sniff Warrants, executed by a trained and certified narcotics-sniffing canine and his handler,

resulted in positive alerts for narcotics, and the two building searches led to the seizure of

evidence including drugs and firearms.  (R&R at 2.)  Hudson argues that the allegations in

the warrant applications were insufficient to support a finding of probable cause, rendering

the warrants invalid in light of material factual omissions.  (Def.'s Supp'l Mem. at 3–10;

Def.'s Objs. at 4.)  Consequently, he moves to suppress the evidence seized pursuant to the

warrants.  Alternatively, Hudson requests a hearing pursuant to *Franks v. Delaware*, 438 U.S.

154 (1978).  (Def.'s Supp'l Mem. at 10–13; Def.'s Objs. at 13.)

All of the warrant applications, which incorporated supporting affidavits, were drafted

by Officer Shawn Fricke, a Brooklyn Park, Minnesota police officer and a detective assigned

to the Hennepin County Sheriff's Violent Offender Task Force.  (Gov't Exs. 1–4 [Doc. Nos.

57-1 to 57-4].)

### A.  K-9 Sniff Warrant for Hudson's Residence

In the K-9 Sniff Warrant application for Hudson's residence, Officer Fricke stated that

Hudson was one of the targets of a long-term FBI/DEA criminal narcotics investigation into

a drug trafficking operation.  (Gov't Ex. 3 (Residence K-9 Sniff Warrant App. at 2).)  The

enterprise allegedly involves marijuana produced at a farming operation in Michigan,

counterfeit oxycodone containing fentanyl obtained from China and pressed into pill form

locally or in the Chicago area, and the distribution of both marijuana and counterfeit

oxycodone pills in Minnesota.  (*Id.*)

As reflected in the application, investigators used a confidential reliable informant

("CRI") to purchase imitation oxycodone pills from Hudson in controlled buys at his music

studio in New Hope, Minnesota.  (*Id.*)  In the past, law enforcement officers had worked with

the CRI, who had accurately and reliably provided names and addresses of suspects involved

in the distribution of narcotics and unlawful possession of firearms, resulting in the seizure of

large quantities of contraband.  (*Id.*)   In the process of conducting surveillance on Hudson,

investigators observed him transacting several other narcotics deals in the parking lot outside

his music studio.  (*Id.*)  They also observed Hudson travel to his residence in Plymouth,

Minnesota directly before or after the narcotics transactions.[1]   (*Id.*)   The CRI informed

investigators that Hudson rents the music studio and keeps narcotics there and at his residence.

(*Id.*)

In his warrant application, Officer Fricke requested permission for a trained and

certified canine and his handler to enter the curtilage of Hudson's residence to sniff the outer

---

[1]     As noted in the R&R, during the period of the investigation, Hudson lived in two different residences in Plymouth, Minnesota, at different times.  (R&R at 3 n.3.)  He initially lived on 53rd Avenue North (his old residence), but later moved to 60th Avenue North (his new residence).  (*Id.*) The applications for the K-9 Sniff Warrant and the Residence Warrant concern Hudson's new residence.

door frame of the front door for the odor of illegal narcotics or to swab the exterior front door for evidence of narcotics activity.  (*Id.*)  Although not at issue here, the K-9 Sniff Warrant for Hudson's music studio was supported by a nearly identical application, and requested permission for the canine to sniff the outer frame of the front door of the business housing the music studio.  (Gov't Ex. 1 (Music Studio K-9 Sniff Warrant App. at 2).)  Hennepin County District Judge Janet Poston reviewed Officer Fricke's applications for the door sniffs of Hudson's home and music studio, approved them, and issued the K-9 Sniff Warrants on December 4, 2019.  (Gov't Ex. 1 (Music Studio K-9 Sniff Warrant at 2); Gov't Ex. 3 (Residence K-9 Sniff Warrant at 2).)

Officer Larson of the Plymouth Police Department and his canine partner, Knight, executed the K-9 Sniff Warrants.  (*See* Gov't Ex. 4 (Residence Warrant App. at 3–4).)  Knight had been trained to detect the presence of narcotics and was certified by the United States Police Canine Association in this regard.  (*Id.*)  Knight positively alerted to the presence of narcotics at the front door of Hudson's residence and at the main door of the building in which the music studio was located.  (*Id*. at 4; Govt's Ex. 2 (Music Studio Warrant App. at 4).)

**B.  Building Warrants**

The following day, Officer Fricke prepared search warrant applications for the searches of Hudson's music studio and residence.  The building warrant applications are substantially identical.  (*Compare* Gov't Ex. 2 (Music Studio Warrant App.) at 1–6, *with* Gov't Ex. 4 (Residence Warrant App.) at 1–6.)  In the applications, Fricke again recounted his role in the FBI/DEA investigation and the use of the CRI in the investigation.  (*See, e.g.,* Gov't Ex. 2 (Music Bldg. Warrant App.) at 2.)  He reiterated that Hudson was a suspected

supplier in the drug trafficking organization, which involved the sale of Michigan-grown marijuana by the pound, along with large amounts of fake oxycodone pills made from Chinese fentanyl. (*Id.*) Officer Fricke stated that the FBI and DEA had recently executed search warrants related to the drug trafficking organization, including searches on Michigan farms, and had seized large amounts of marijuana, thousands of pills of fentanyl labeled as oxycodone, as well as U.S. currency, firearms, and related documents. (*Id.* at 2–3.)

Again, Officer Fricke recounted that Hudson operates his narcotics transactions from his music studio in New Hope, and that controlled buys had been made inside the music studio in the course of the investigation. (*Id.* at 3.) In addition, he stated that while conducting surveillance, law enforcement personnel had observed several other narcotics transactions either in the music studio's parking lot, or inside the business, and that Hudson spent a large amount of time in the studio. (*Id.*) The CRI confirmed that Hudson rents a recording studio in this space, sometimes spending days at a time there. (*Id.*)

Officer Fricke stated that officers had obtained a layout plan of the building that houses Hudson's music studio. (*Id.*) The main door of the relevant portion of the building opens into a reception/lounge space and contains individual rented studios along the outside walls of the interior, behind the reception area. (*Id.*) Officers had learned that Hudson's studio was on the east side of the building, closest to the main door, and further determined from surveillance that the main door is always kept locked, requiring visitors to either use a key or be admitted into the building by an occupant. (*Id.*)

In the applications for the two Building Search Warrants, Officer Fricke again noted that Hudson resides in Plymouth, and that officers had observed him traveling to his residence

either before or after he conducted narcotics transactions. (*Id.*) Officer Fricke stated that the residence was rented by Hudson's girlfriend, who is also the registered owner of the vehicles commonly driven by Hudson. (*Id.*) According to the CRI, Hudson keeps narcotics at both the music studio and his residence. (*Id.* at 4.)

Officer Fricke then described the K-9 Sniff Warrants that were executed the previous day at the main doors of Hudson's music studio building and his residence, noting that canine Knight had demonstrated a positive alert for the presence of narcotics at both locations. (*Id.*)

Based on the foregoing, Officer Fricke requested permission to search both buildings for various types of drugs, drug paraphernalia, and related evidence. (*Id.*) Judge Janet Poston, who had authorized the K-9 Sniff Warrants the previous day, also reviewed the applications for the Building Warrants. Judge Poston approved the Building Warrants and issued them on December 5, 2019. (Gov't Ex. 2 (Music Studio Warrant at 3); Gov't Ex. 4 (Residence Warrant at 3).)

Officers executed both warrants on December 10, 2019. (Gov't Ex. 2 (Music Studio Warrant Return at 1); Gov't Ex. 4 (Residence Warrant Return at 1).) Among the items that Officers seized were drugs, guns, a digital scale, cash, and cell phones. (*Id.* (Music Studio Warrant Return at 1); Gov't Ex. 4 (Residence Warrant Return at 1–5).) On February 5, 2020, a federal grand jury returned the Indictment in this case. (Indictment at 2.)

**C. Motions to Suppress**

In November 2020, Hudson moved to suppress the evidence obtained from the K-9 sniff of his home, and the searches of his music studio and home, arguing that the Building

Search Warrants and the K-9 Sniff Warrant for his residence[2] lacked probable cause due to staleness and a lack of specificity. (Def.'s Am. Mot. to Supp. [Doc. No. 55] at 1–3.) An evidentiary hearing was held on September 17, 2020, followed by supplemental briefing [Doc. Nos. 74, 76]. Magistrate Judge Schultz issued the R&R in December 2020, recommending the denial of Hudson's motions. (R&R at 20.)

In the R&R, the magistrate judge first found that sufficient probable cause supported the K-9 Sniff Warrant of Hudson's new residence for the following reasons: (1) investigators observed him travel to and from his old residence immediately before or after conducting controlled buys at his music studio; (2) the CRI knew he kept narcotics at both his music studio and his residence; and (3) the warrant application established that Hudson keeps narcotics where he lives, regardless of whether the K-9 sniff was ultimately conducted at his new residence. (*Id*. at 9–10.) In addition, Magistrate Judge Schultz rejected Hudson's argument that the information in the warrant application was stale because it failed to sufficiently identify by date ongoing drug activity between May 2019 and December 2019. (*Id*.) He also noted extrinsic evidence that demonstrated Hudson's continued conduct, citing Officer Fricke's motions hearing testimony that in November 2019, Hudson had supplied the CRI with a sample of fake Oxycodone pills and offered to sell him up to twenty pounds of

---

[2]     As noted earlier, Hudson does not challenge the K-9 Sniff Warrant for the music studio. (Def.'s Supp'l Mem. at 3) ("Hudson concedes a warrant was not necessary for the dog sniff of his music studio front door."). Because the music studio was in a commercial establishment, not Hudson's residence, a search warrant was not required to conduct the dog sniff at the music studio, unlike the search of a home. *See Florida v. Jardines*, 569 U.S. 1, 9–10 (2013) (finding a warrantless dog sniff outside curtilage of home involved an intrusion into a constitutionally protected area).

marijuana, as well as Officer Fricke's testimony that a cooperating witness confirmed that

Hudson could sell both pills and marijuana at that time. (*Id*. at 13.)  Even absent the extrinsic

evidence, however, the magistrate judge found that the K-9 Sniff Warrant for Hudson's

residence was supported by probable cause, and in any event, he deferred to the issuing

judge's probable cause determination. (*Id*. at 13–15 & n.7.)

Likewise, Magistrate Judge Schultz found the Building Warrants were sufficiently

supported by probable cause. (*Id*. at 14–16.)  As to both of them, he noted the positive K-9

alerts, and with respect to the music studio search, he also cited the CRI's controlled buys

inside the music studio, and officers' surveillance that demonstrated the amount of time

Hudson spent at the studio as well as their observations of Hudson conducting several

narcotics transactions in the parking lot. (*Id*.)

Finally, the magistrate judge found that even if probable cause was lacking, the

evidence would still be admissible pursuant to the good-faith doctrine in *United States v.*

*Leon*, 468 U.S. 897 (1984).  (R&R at 17.)

Hudson filed no objections to the R&R within the relevant time period, and the Court

issued an Order on January 6, 2021, adopting the R&R and denying Hudson's suppression

motions [Doc. No. 80].

Subsequently, the Court granted a motion to withdraw as counsel filed by Defendant's

former counsel, Christa Groshek [Doc. No. 99].  In June 2021, the Court appointed current

counsel, Jordan Kushner, to represent Defendant [Doc. No. 101].  In August 2021, Mr.

Kushner moved for leave to file objections to the R&R [Doc. No. 104], which the Court

granted [Doc. No. 113].

### D. Objections

In his Objections, Hudson argues that the warrant applications were facially inadequate and omitted evidence that would have further negated probable cause. (Def.'s Objs. at 6–9.) He contends that Magistrate Judge Schultz erroneously found that the warrants were valid within the four corners, and then examined extrinsic evidence to erroneously conclude that the extrinsic evidence also validated the warrants. (*Id*. at 7–9.) Hudson also takes issue with the magistrate judge's application of the good-faith exception to the exclusionary rule. (*Id*. at 10.) Specifically, he argues that Officer Fricke's failure to disclose in the warrant applications that the controlled buys occurred four to seven months earlier, and that only one of them yielded verified controlled substances, was a material omission that negated a finding of probable cause and the application of the good-faith exception. (*Id*. at 10–12.) Hudson asserts that the Government failed to sufficiently demonstrate that Officer Fricke withheld information from the warrant applications out of genuine concern for protecting the CRI rather than to increase his chances of obtaining warrants from Judge Poston. (*Id*. at 12.) Thus, he argues, the evidence obtained from the warrants must be suppressed, or in the alternative, he is entitled to "an actual *Franks* hearing." (*Id*.)

## II.   DISCUSSION

The district court reviews the magistrate judge's recommendations on dispositive matters de novo, undertaking an independent analysis of those portions of the R&R to which a party objects. 28 U.S.C. § 636(b)(1)(C); *see also* D. Minn. L.R. 72.2(b)(3).

### A. Probable Cause

Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place given the circumstances set forth in the affidavit." *United States. v. Tellez*, 217 F.3d 547, 549 (8th Cir. 2000).  When the issuing judge relies solely upon a supporting affidavit to issue the search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause."  *United States v. O'Dell*, 766 F.3d 870, 874 (8th Cir. 2014). Judges issuing search warrants may "draw reasonable inferences from the totality of the circumstances" when reading a warrant application to determine whether probable cause exists.  *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009).  Reviewing courts afford "great deference" to the issuing judge's "initial, on-the-scene determination that probable cause has been established."  *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010).  As long as the issuing judge had a "substantial basis" for determining that the search would "uncover evidence of wrongdoing," the Court must uphold the probable cause determination. *United States v. Horn*, 187 F.3d 781, 785 (8th Cir. 1999).

### 1. K-9 Sniff Warrant for Residence

Hudson argues that probable cause was lacking for the dog sniff of his residence because the warrant application failed to describe when the transactions occurred, failed to provide a basis for the CRI's allegation that Hudson kept drugs in his home, and failed to explain why investigators believed that Hudson was part of a large-scale drug trafficking organization.  (Def.'s Objs. at 4–6.)

10

The Court finds that sufficient probable cause supported the issuance of the K-9 Sniff Warrant for Hudson's residence.  The affidavit and application relied on information from a CRI with a proven record of reliability.  The CRI stated that Hudson supplied drugs out of his music studio and kept narcotics there and at his home.  (Gov't Ex. 3 (Residence K-9 Sniff Warrant App.) at 2.)  Independently, officers had observed Hudson travel to and from his home before or after narcotics transactions, and they also verified that Hudson's girlfriend rented the residence.  (*Id.*)  And regardless of whether officers had observed Hudson traveling to or from his new residence or his old residence—the warrant application simply refers to his "house" or "home"—they observed him traveling to and from *the place where he resides*, immediately before or after conducting a drug sale.  The Court agrees with the magistrate judge that when Hudson moved to a new residence, it was reasonable to infer that the drugs moved too.  (R&R at 11.)

As noted in the R&R, (*id.* at 11), with respect to Hudson's claim of staleness, "[t]here is no fixed formula for determining when information becomes stale," but rather, "the timeliness of the information depends on the circumstances of the case, including the nature of the crime under investigation and the property sought in the search."  *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005).  Hudson urges the Court to "examine *Kennedy* instead of just citing it," (Def.'s Objs. at 5), as the court in *Kennedy* found probable cause was lacking due to an absence of temporal information regarding when the defendant had most recently hidden narcotics in his car.  *Kennedy*, 427 F.3d at 1142.  The facts of *Kennedy*, however, are quite different from the facts here. In *Kennedy*, the Eighth Circuit noted that where the suspected criminal activity is continuing in nature, "the passage of time may be less

11

significant," and observed that "Kennedy was not the subject of an ongoing narcotics investigation; he was stopped on suspicion that he was involved in a burglary and arrested for driving without a license." *Id.* Also, officers had relied on a single conversation with Kennedy's former girlfriend prior to conducting the search of his car. *Id.* In contrast, the K-9 Sniff Warrant application here was based on an ongoing narcotics investigation, with information about Hudson's continuing drug transactions coming from a CRI's interactions with Hudson and officers' ongoing surveillance. (Gov't Ex. 3 (Residence K-9 Sniff Warrant App.) at 2.)

Moreover, the investigators' observations and the CRI's personal knowledge linking Hudson's residence to his drug distribution activity support a reasonable inference that investigators would find evidence of contraband at his residence. *United States v. Koons*, 300 F.3d 985, 990 (8th Cir. 2002) ("An informant's tip is sufficient to support probable cause if the totality of the circumstances show that it is reliable."). The information that the CRI provided here ultimately proved to be correct, as the canine alerted to the scent of narcotics at Hudson's residence, (Gov't Ex. 4 (Residence Warrant App. at 3–4)), officers found drugs and drug paraphernalia in Hudson's home. (*Id.* (Residence Warrant Return at 1–5).) Moreover, as a general matter, the CRI had reliably provided investigators with information in the past regarding illegal drug distribution and unlawful gun possession in the Twin Cities. (*See* Gov't Ex. 3 (Residence K-9 Sniff Warrant App. at 2).) All of these facts support a finding that the information used to establish probable cause for the K-9 Sniff Warrant for Hudson's residence was not stale. Additionally, even if probable cause did not exist for this

warrant, the evidence is admissible under *Leon*'s good-faith exception, as discussed in greater detail below.

The Court notes that in the context of addressing probable cause for the K-9 Residence Sniff Warrant, the magistrate judge cited testimony elicited at the motions hearing.  (R&R at 12–13.)  While the magistrate judge did so to counter extrinsic evidence on which Hudson had relied, (*id*. at 13), the Court's proper focus here is limited to the four corners of the affidavit, and the R&R is modified in this regard.  *O'Dell*, 766 F.3d at 874.  However, the magistrate judge also made clear that even without the extrinsic evidence, the warrant was supported by probable cause.  (R&R at 14 n.7.)

### 2.  Building Warrants for Music Studio and Residence

Hudson also takes issue with the magistrate judge's finding that the positive K-9 sniff at the front entrance to the studio building provided probable cause to issue the warrant for the search of his studio.  (Def.'s Objs. at 7.)  Because the building housed approximately ten music studios, he argues that the dog's alert provided no indication that Hudson's particular studio contained drugs.  (*Id*.)  In addition, he contends that the magistrate judge credited the CRI's information without any substantiation, including specifics regarding the time or circumstances of the alleged transactions.  (*Id*.)

The Court disagrees.  First, as to the positive K-9 sniff at the music studio, the application for the building warrant described the layout of the building, noting that Hudson's studio was the studio closest to the main door.  (Gov't Ex. 2 (Music Studio Warrant App.) at 3.)  It also noted, "[f]rom surveillance the main door of the business that leads to the studios is always locked" and "people entering the studio area have to be let in or key their way into

the building." (*Id.*)  It noted that the canine, Knight, was specifically certified and trained to

sniff the outer door frames of businesses and residences for the odor of illegal narcotics, and

positively alerted to the presence of narcotics at the studio building's main door.  (*Id.* at 4.)

Second, in addition to the dog's alert to the presence of narcotics, the affidavit for the

music studio search warrant relied on information from the CRI concerning Hudson's

frequent use of the music studio to conduct drug transactions.  (*Id.* at 3–4.)  During the

investigation, officers arranged a series of controlled buys from Hudson at the music studio,

and independently observed several other narcotics transactions in the parking lot of the

business or inside the building. (*Id.* at 3.)

With respect to the warrant for the search of Hudson's residence, the application

similarly noted that the trained and certified drug-sniffing canine had alerted to the presence

of narcotics at the front door of Hudson's house.  (Gov't Ex. 4 (Residence Warrant App.) at

4.)  Again, the application detailed the CRI's information that Hudson kept narcotics both at

home and at his music studio, (*id.* at 3), and noted that officers had observed Hudson travel

directly between his home and music studio before or after conducting drug transactions.  (*Id.*)

The application further stated that Hudson's girlfriend rented the house, she was the registered

owner of vehicles that Hudson used, and she listed the home's address on her driver's license.

(*Id.*)

The Court finds that all of this combined information provided sufficient probable

cause for the issuance of the search warrants for the music studio and for Hudson's house.  At

both buildings, a trained canine detected the presence of narcotics at the doors. While the

warrant applications may not have itemized the dates of the controlled buys or surveillance

of drug transactions, they make clear that this conduct was part of an ongoing narcotics operation, as the Court has discussed with respect to the K-9 Sniff Warrant for Hudson's residence.  As noted, because the nature of the crime under investigation was a large-scale, ongoing narcotics operation, the passage of time was less significant here.  *See Kennedy*, 427 F.3d at 1141–42.  Accordingly, the Court finds that the information used to establish probable cause was not stale.  And, as discussed below, even absent sufficient probable cause in the applications, the good-faith exception under *Leon* applies under these facts.

## B.  Good Faith

The Fourth Amendment protects against unreasonable searches and seizures and requires search warrants to be supported by probable cause and to "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  When evidence is obtained in violation of the Fourth Amendment, it may be suppressed pursuant to the exclusionary rule.  *Leon*, 468 U.S. at 906.  The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."  *Id*. (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

In *Leon*, the Supreme Court held that when evidence is obtained by officers reasonably relying on a search warrant, the good-faith exception to the exclusionary rule may apply.  *Id.* at 922–23.  Under the good-faith exception, "disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant."  *United States v. Hudspeth*, 525 F.3d 667, 676 (8th Cir. 2008) (internal citation omitted).    The

suppression of evidence obtained from a warrant is determined on a case-by-case basis. *Leon*, 468 U.S. at 918. "[T]he fact that a neutral [judge] has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in objective good faith." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation omitted). The Supreme Court has opined that "the threshold for establishing [that *Leon* does not apply] is a high one, and it should be." *Leon*, 468 U.S. at 923.

In *Leon*, the United States Supreme Court identified four circumstances in which the good faith exception does not apply. *Id*. at 922–23. Hudson relies on a variation of the first circumstance, which arises when the issuing judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth. *Id*. at 923 (citing *Franks*, 438 U.S. 154). Here, Hudson argues that the officer deliberately *withheld* information material to the issue of probable cause. Specifically, he contends that Officer Fricke failed to disclose that the controlled buys referenced in the warrant applications occurred four and a half to seven and a half months prior to the submission of the warrant application, and that only one of the controlled buys yielded verified controlled substances. (Def.'s Objs. at 10.) These omissions, he argues, were material and negate a finding of probable cause and preclude the application of the good-faith exception. (*Id*.)

When assessing good faith, a reviewing court may consider information known to the officers but not presented to the issuing judge. *See, e.g., United States v. Thompson*, 976 F.3d 815, 822 (8th Cir. 2020). Officer Fricke and FBI Agent Michael Cannizzaro, Jr. testified at the motions hearing and explained their significant concerns about protecting the identity of

the CRI, given the nature of the organization under investigation.  (Sept. 17, 2020 Hr'g Tr. [Doc. No. 71] at 34–35, 66–69.)  Officer Fricke stated that as a general matter, in large-scale narcotics investigations, he does not typically provide specific dates of drug transactions in order to protect informants from being identified by other members of the drug organization. (*Id*. at 34–35.)  And Agent Cannizzaro testified, in particular, that on New Year's Eve 2019, members of the wider drug trafficking organization at issue here had kidnapped a female real estate agent, tortured her in order to identify the location of her boyfriend, who was believed to be an informant, attempted to murder the boyfriend by shooting him several times, and executed the woman.  (*Id*. at 66–69.)

Regarding the "staleness" of information concerning Hudson, Office Fricke testified that at the time he applied for the search warrants in December 2019, he was aware of additional information that an informant or witness had provided to investigators in November 2019 about Hudson's continued involvement in distributing drugs.  (*Id*. at 41–43.) He further testified that when he applied for the search warrants, the issuing judge did not ask any questions regarding probable cause and had no hesitation in signing the warrants.  (*Id*. at 44.)  He stated that at the time he applied for and received the search warrants, he believed they were facially valid.  (*Id*.)

Agent Cannizzaro testified that in November 2019, he spoke with an informant who indicated that he had met with Hudson the previous day.  (*Id*. at 69–70.)  The informant stated that Hudson was trying to keep a low profile because "things were hot now," which Agent Cannizzaro understood to be a reference to the fact that search warrants had been executed a few weeks earlier in October 2019 in the Twin Cities and in Michigan.  (*Id*.)  The informant

further relayed that Hudson nevertheless expressed his ability to sell imitation Oxycodone

pills and up to 20 pounds of marijuana at a time, and provided the informant with a sample of

pills.  (*Id.* at 70–71.)  Agent Cannizzaro also testified that he interviewed a witness in late

November 2019 who had previously purchased controlled substances from Hudson.  (*Id.* at

72–73.)  The witness stated that he or she would be able to purchase pills and marijuana from

Hudson at his music studio as of the date of the interview.  (*Id.*)   Agent Cannizzaro also

verified that he transmitted this information regarding the November 2019 contacts with

Hudson to Officer Fricke before Officer Fricke obtained the search warrants in early

December 2019.  (*Id.* at 73–74.)

The Court finds that all of this information supports a finding that Officer Fricke had

a good-faith belief in the accuracy and validity of the information that he presented to the

issuing judge and did not recklessly or willfully withhold information in order to obtain the

warrants.  *See Leon*, 468 U.S. at 923.  Moreover, excluding the evidence here would not serve

the purpose of the exclusionary rule.  To trigger the exclusionary rule, the law enforcement

conduct in question "must be sufficiently deliberate that exclusion can meaningfully deter it,

and sufficiently culpable that such deterrence is worth the price paid by the justice system."

*Herring v. United States*, 555 U.S. 135, 144 (2009); *see also Davis v. United States*, 564 U.S.

229, 240 (2011); *United States v. Szczerba*, 897 F.3d 929, 937–38 (8th Cir. 2018).  Because

the Court finds that Officer Fricke acted in good faith, "the deterrence rationale loses much

of its force, and exclusion cannot pay its way."  *Davis*, 564 U.S. at 236–38 (internal citations

and quotations omitted).  Accordingly, even if probable cause was lacking with respect to the

search warrant applications here, the evidence is admissible under the good-faith exception to the exclusionary rule.

Finally, with respect to Hudson's alternative request for a *Franks* hearing, it is denied. First, the Court agrees with the magistrate judge that Hudson failed to make the required preliminary showing for such a hearing, (R&R at 20) (citing *United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004)), and, in any event, as the Government observes, Hudson has already had the functional equivalent of a *Franks* hearing.  (*See* Gov't's Opp'n at 3.)  At the September 17, 2020 motions hearing, Officer Fricke and Agent Cannizzaro testified beyond the four corners of the search warrants and explained why certain information was omitted from the search warrant applications.  (Sept. 17, 2020 Hr'g Tr. at 34–35, 66–69.)  They also testified about additional evidence from informants and witnesses, not included in the warrant applications, that further supports a finding of probable cause.  (*Id*. at 41–43, 69–74.) Hudson's prior counsel fully cross-examined both witnesses at the motions hearing, and subsequently filed supplemental briefing, which the magistrate judge carefully considered in the R&R.

Second, regardless of whether Hudson is entitled to "an actual *Franks* hearing," such a hearing would be irrelevant because under these facts, Hudson is not entitled to relief under *Franks*.  In order to obtain such relief, a defendant must show:  "(1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *United States v. Miller*, __ F.4th __, No. 20-2857, 2021 WL 4022666, at *5 (8th Cir. Sept. 3, 2021).  Not only is there no showing here that Officer

19

Fricke intentionally omitted facts in order to make the warrant applications misleading, but if the applications had contained *all* of the omitted information such as the precise dates of the controlled buys and contacts, which included drug-related contacts as recent as November 2019, and that only one of the controlled buys yielded verified controlled substances, the applications would still have been supported by probable cause. *Id*. at *6 ("The proper course is to consider the affidavit as if the omissions had been included.")   Had this information been included, it would have bolstered a finding of probable cause—particularly the information concerning Hudson's November contacts with the CRI and a witness in which Hudson indicated his ability to sell them narcotics.  Hudson's alternative request for a *Franks* hearing is therefore denied.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Unlawful Searches [Doc. No. 18] is **DENIED**.

2. Defendant's Motion to Suppress [Doc. No. 50] is **DENIED**.

3. Defendant's Amended Motion to Suppress [Doc. No. 55] is **DENIED**.

4. The Report & Recommendation [Doc. No. 77] is **ADOPTED, as modified**.

5. Defendant's Objections [Doc. No. 114] to the Report & Recommendation are **OVERRULED**.

Dated:  October 4, 2021                                              s/Susan Richard Nelson
                                                                                 SUSAN RICHARD NELSON
                                                                                 United States District Judge